UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 3:19-cr-00030(VLB) |
| | : | |
| MAHDI HENDERSON | : | |
| Defendant. | : | December 11, 2020 |
| | : | |

### MEMORANDUM OF DECISION DENYING DEFENDANT MAHDI HENDERSON'S MOTION FOR A REDUCTION OF SENTENCE, [Dkt. 51]

Before the Court is Defendant Mahdi Henderson's motion for a reduction of his sentence to provide for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). [Dkts. 51]. Defendant seeks a modification of his sentence from incarceration to home confinement based on his asserted risk of severe complications should he contract COVID-19 while in the custody of the Bureau of Prisons, presently incarcerated at FCI Schuylkill. [*Id.*]. The Government opposes Defendant's motion. [Dkt. 55]. For reasons set forth below, the Court DENIES Defendant's motion.

### Background

In February 2019, Mr. Henderson was charged by indictment with Unlawful Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(l) and 924(a)(2). [Dkt. 1 (Indictment)]. Mr. Henderson pled guilty to an information adjudicating him guilty of violating the same provisions of the federal criminal code

1

charged in the indictment. [Dkt. 25 (Information)]; [Dkt. 31 (Plea Agreement)]; [Dkt. 35 (Order accepting plea and adjudicating Defendant guilty)].

The indictment arose from the discovery of a loaded semi-automatic pistol during the execution of a state search warrant in conjunction with an unrelated homicide investigation. [Dkt. 37 (Pre-Sentence Investigation Report) ¶ 12](hereinafter PSR); see [Dkt. 50 (Sentencing Tr.) at 7:10-07:12](hereinafter Sent. Tr.).[1] The pistol was discovered under a couch where Mr. Henderson was seated. [PSR ¶ 13]. Mr. Henderson and the other occupants of the apartment denied knowledge of the firearm. [*Id.*]. Local police photographed the gun at the scene then seized it and sent it to the Connecticut state lab for DNA testing. [PSR ¶ 14]. The lab tested the firearm and concluded that it is 100 billion times more likely that the DNA on the trigger originated from Mr. Henderson and three unknown individuals than four unknown individuals. [*Id.*]. The pistol was also stolen. [PSR ¶ 23].

Mr. Henderson has three prior state felony convictions, all serious and recent. In 2012, at age 17, he was convicted of Burglary 2nd Degree and sentenced to five years' jail, concurrent. [PSR ¶ 35]. He was also convicted of Assault 1st Degree, and No Pistol Permit. [PSR ¶ 36]. On the assault charge, Mr. Henderson was sentenced to ten years' jail, five to serve, concurrent with his sentence for

---

[1] At sentencing, the Court confirmed that Defendant read the PSR. Defendant did not have any objections to the facts as presented in the PSR and the Court adopted the PSR as its finding of fact, as modified to reflect that Mr. Henderson was not charged with illegally possessing the ammunition loaded in the firearm. [Dkt. 50 (Sentencing Tr.) at 04:03-05:17].

burglary and no pistol permit. [*Id.*]. According to the excerpts of the police report filed by Probation, Mr. Henderson shot another teenager five times: twice in the abdomen, once in the groin, and once in each leg. [Dkt. 42 (Suppl. PSR)]. At sentencing, the Defendant conceded that he shot the person and instead argued that he was young and it was "quite some time ago." [Sent. Tr. at 14:14-14:20]. Mr. Henderson was on probation for his assault conviction when he committed this criminal offense involving a firearm. [PSR ¶ 38].

The parties, the Probation Office, and the Court all agreed on the applicable advisory sentencing guideline calculation, recommending a sentence of thirty-seven to forty-six months of imprisonment, with a three-year period of supervised release, a fine of $10,000 to $100,000, which the defendant was unable to pay, and a $100 mandatory special assessment. [Sent. Tr. at 35:03-35:19].

When imposing the sentence, the Court considered that Defendant's crime suggested a resurgence of criminal activity as "an individual who not too long ago had the propensity to repeatedly shoot a person in places each of which could have caused their death, is a person who certainly has no business with a gun in their hand." [Sent. Tr. at 33:16-33:19]. The Court stressed the need to promote respect for the law given the Defendant's willful violation of the law, to deter the Defendant from returning to potentially lethal criminal activity again, and to protect the public from his impulsivity and poor decision making. [Sent. Tr. at 33:16-34:17]. The Court considered Mr. Henderson's "deplorable upbringing," but there was no evidence to suggest that his upbringing had a causative effect on his criminal conduct. [Sent. Tr. at 33:23-34:05].

Taking all of the 18 U.S.C. § 3553(a) sentencing factors into account, the Court sentenced Mr. Henderson to a guideline sentence of 37 months of imprisonment, with a three-year term of supervised release to follow. [Dkt. 48 (Crim. J.)].

A review of the Bureau of Prison's ("BOP") Inmate Locator confirms that Mr. Henderson is designated to FCI Schuylkill, a medium security federal prison in Pennsylvania. *See Inmate Locator Service, BOP Registration no. 26188-014* Fed. Bureau of Prisons, https://www.bop.gov/inmateloc/, (reviewed on Dec. 08, 2020). According to the BOP's Inmate Locator Service, his current release date is now June 28, 2021. *Id.*

## Legal Standard

"Federal courts are forbidden, as a general matter, to 'modify a term of imprisonment once it has been imposed'; but the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011) (citations omitted) (quoting 18 U.S.C. § 3582(c)). The statute providing for the finality of a criminal judgment contains a narrow exception to provide for re-sentencing for compassionate release. 18 U.S.C. § 3582(c)(1)(A).

Section 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows:

> **[T]he court ... upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose**

4

> a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

The specific provision under which Defendant seeks relief from his sentence, the First Step Act of 2018 (as amended), imposes procedural prerequisites to filing a motion for resentencing to provide compassionate release. First Step Act of 2018, Section 603(b), Pub. L. 115-391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)). Previously, only the Bureau of Prisons ("BOP") could move for compassionate release and such motions were rarely filed. *United States v. Brooker*, 976 F.3d 228, 231-32 (2d Cir. 2020). The First Step Act amendments were intended to address past inaction by the BOP by removing the BOP as the sole arbiter of compassionate release, while still permitting the BOP to weigh-in on a defendant's request via the statute's exhaustion of administrative remedies requirement. See *id.* at 232; *see also United States v. Gamble*, No. 3:18-CR-0022-4(VLB), 2020 WL 1955338, at *3 (D. Conn. Apr. 23, 2020)(explaining the policy purpose behind the exhaustion requirement in this context).

Recently, in *Brooker*, the Second Circuit held that since the BOP no longer has exclusive authority to bring a motion for compassionate release, district courts have the discretion to determine what constitutes "extraordinary and compelling" circumstances outside of the outdated U.S. Sentencing Commission policy statements when the defendant moves for compassionate release. 976 F. 3d at 234-36. In short, the statute only requires courts to consider "applicable" statements issued by the U.S. Sentencing Commission and the relevant policy statement,

5

U.S.S.G. § 1B1.13, is no longer "applicable" because the policy statement refers exclusively to a motion brought by the Director of the BOP. *Id.* at 235-36. In other words, "[w]hen the BOP fails to act, Congress made the courts the decision maker as to compassionate release." *Id.* at 236. Therefore, courts may consider "…the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release," and not just those delineated by the U.S. Sentencing Commission's policy statement. *Id.* at 237.

Consequently, the Court may grant a Defendant's motion for compassionate release if: (1) the Defendant has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the Warden, and (2) the Court finds that, after considering the Section 3553(a) factors, that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment.

As to what constitutes "extraordinary and compelling" circumstances, this Court and others have recognized that an inmate's especially heightened risk of infection and risk of developing severe complications from COVID-19 based on their specific medical history may constitute "extraordinary and compelling" reasons to grant compassionate release, often in combination with other factors. *See, e.g. United States v. Jepsen*, 451 F. Supp. 3d 242, 245-47 (D. Conn. 2020) (granting motion for compassionate release where defendant suffers from a compromised immune system and defendant had less than eight weeks remaining on sentence); *United States v. Miller*, No. 3:15-CR-132-2 (VLB), 2020 WL 3187348, at *5 (D. Conn. June 15, 2020)(granting motion for compassionate release for severely ill defendant with less than three months remaining on sentence).

Courts considering defendants' medical vulnerability from COVID-19 ordinarily look to the CDC's guidance on at-risk health populations. *See United States v. Rivera*, No. 3:13-CR-71-1 (VLB), 2020 WL 3186539, at *4-5 (D. Conn. June 15, 2020); *see also, e.g., United States v. Adams*, No. 3:16-CR-86-VLB, 2020 WL 3026458, at *2 (D. Conn. June 4, 2020); *United States v. McCarthy*, No. 3:17-CR-0230 (JCH), 2020 WL 1698732, at *5 (D. Conn. Apr. 8, 2020). In determining whether a defendant's medical vulnerability to the virus constitutes "extraordinary and compelling" reasons for re-sentencing, courts have considered a multitude of factors in factually intensive inquiries, including: defendants' age, the severity and documented history of their health conditions, defendants' history of managing those conditions in prison, the proliferation and status of infection at defendants' facilities, and the proportion of the term of incarceration that has been served. *United States v. Brady*, No. S2 18 CR. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020)(citations omitted).

The defendant bears the burden of proving that he is entitled to a sentence reduction. *United States v. Gagne*, 451 F. Supp. 3d 230, 234 (D. Conn. 2020). The district courts have broad discretion in deciding whether to grant or deny a motion for compassionate release. *United States v. Gileno*, 448 F. Supp. 3d 183, 186 (D. Conn. 2020); *see also* § 3582(c)(1)(A) ("[T]he court…may reduce the term of imprisonment...").

## Discussion

I. **Exhaustion of administrative remedies pursuant to 18 U.S.C. § 3582(c)(1)(A)**

Pursuant to 18 U.S.C. § 3582(c)(1)(A), a defendant must either "…fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf <u>or</u> the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." (underlining added).

Mr. Henderson first requested relief from the warden of FCI Schuylkill on May 5, 2020. [Dkt. 55-1 (Henderson Inmate Request)]. On May 19, 2020, Warden Scott Finley denied Mr. Henderson's request for the BOP to file a motion on his behalf to modify his sentence. [Dkt. 55-2 (BOP Resp.)]. Since this motion was filed more than thirty days after Mr. Henderson's initial request, the administrative exhaustion requirement set forth in § 3582(c)(1)(A) is satisfied.

Notwithstanding having satisfied the exhaustion requirement, the Court denies Defendant's motion because he fails to establish "extraordinary and compelling" reasons to modify his sentence and the § 3553(a) sentencing factors do not balance in favor of the proposed modification as explained below.

II. <u>Whether Mr. Henderson establishes "extraordinary and compelling" reasons to reduce his sentence</u>.

Mr. Henderson argues that, notwithstanding his young age, he has a heightened risk of severe illness or death if he contracts COVID-19 because of his asthma and obesity. [Dkt. 51 (Def. Mem. in Supp.)]. Mr. Henderson argues that "[t]here is a rapidly growing outbreak of COVID-19 at FCI Schuylkill, with high levels of infection already confirmed." [*Id*. at 5]. Mr. Henderson argues that his custodial status renders him especially susceptible to contracting the virus, which, coupled

8

with his heightened risk of complications, constitutes "extraordinary and compelling" reasons to reduce his sentence. [*Id.* at 7-10].

Mr. Henderson argues that the time he has already served is enough to satisfy the purposes of sentencing in light of the risk to his health from coronavirus, his traumatic upbringing, and his need for mental health treatment. [*Id.* at 12]. He proposes to reside with his father, subject to home confinement, where he would seek weekly psychotherapy treatment and search for employment with the support of a local organization and the U.S. Probation Office. [*Id.* at 11].

In opposition, the Government argues that Mr. Henderson, who is now 26 years old, is not a suitable candidate for release. [Dkt. 5 (Gov. Mem. in Opp'n)]. The Government agrees that Mr. Henderson's body mass index (BMI) of about 32 kg/m$^2$ classifies him as obese and therefore he has a recognized heightened risk of complications should he contract COVID-19 based on the applicable CDC criteria. [*Id.* at 7-8]. The Government concedes that Defendant's more definitive risk of severe complications from the virus due to his obesity and his potential risk due to asthma, regardless of his age, may establish "extraordinary and compelling" circumstances. [*Id.*]. The Government refutes, however, Defendant's claim that there is an ongoing outbreak at FCI Schuylkill. [*Id.* at 8-9].

Instead, the Government argues that even if Mr. Henderson establishes "extraordinary and compelling" reasons to modify his sentence, he remains a danger to the public and a sentence of home confinement would not comport with the purposes of sentencing. [*Id.* at 10-12]. The Government argues that Mr.

9

Henderson has a troubling criminal history and reengaged in criminal activity while on probation for his conviction for shooting another person five times. [*Id.* at 10-11]. The Government submits that the Court's concerns at sentencing regarding the need to deter Mr. Henderson from returning to criminal activity, promoting respect for the law, and protecting the public remain equally applicable now. [*Id.*]. The Government filed a copy of a BOP disciplinary ticket showing that, on May 6, 2020, he was found to be in possession of drugs or alcohol. [Dkt. 51-4 (BOP Disciplinary Ticket No. 3395521)]. The Court notes that the serious infraction occurred one day after Mr. Henderson submitted his request for compassionate release to the warden. He was sanctioned for the infraction after a hearing in June 2020, which included placement in disciplinary segregation for thirty days, loss of good time credits, and the loss of various institutional privileges for six months. [*Id.*].

The Court begins with the general premise that individuals held in jails and prisons are more likely than the general public to contract COVID-19. At present, the BOP reports that over 23,500 inmates have recovered from the virus and over 6,800 remain positive nationwide. *See* Fed. Bureau of Prisons, *BOP COVID-19 Cases* (Table), https://www.bop.gov/coronavirus/index.jsp, (last reviewed Dec. 10, 2020). Without accounting for decreases in the BOP's population, about a quarter of prisoners now in BOP custody have or have had COVID-19. *Id.* By comparison, the Connecticut Department of Public Health has reported approximately 143,000 suspected or confirmed COVID-19 cases, so with a population of approximately 3.565 million people, about 4% of the state's population is known to have been

infected by coronavirus. Conn. Dep't. of Pub. Health, *Coronavirus Disease 2019 (COVID-19)*, https://portal.ct.gov/coronavirus (last updated on Dec. 10, 2020); Conn. Dep't. Pub. Health, *Annual Town and County Population for Connecticut-2018*, https://portal.ct.gov/DPH/Health-Information-Systems--Reporting/Population/Annual-Town-and-County-Population-for-Connecticut).[2]

The Court is of the view that the increased likelihood of contracting COVID-19 in a custodial setting generally does not itself constitute "extraordinary and compelling reasons" for compassionate release for every inmate or detainee without regard to their particular susceptibility. With this backdrop, the Court has closely reviewed the most recent CDC guidance identifying persons at risk of severe complications if they contract COVID-19, along with Mr. Henderson's medical records, conditions at FCI Schulkill where he has been incarcerated, and his personal characteristics.

For the last several months, the CDC has classified underlying health conditions that correlate to an increased risk of severe complications from contracting COVID-19 into two categories; conditions that are known to cause an increased risk of severe illness and those that might increase a person's risk. *People with certain medical conditions*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-

---

[2] The Court recognizes that these statistics are imperfect as reporting methodologies among different government agencies vary. They are cited for illustrative purposes.

medical-conditions.html (last updated Dec. 01, 2020). The conditions listed are regularly updated as the CDC reviews new scientific research.

Mr. Henderson's current BOP health conditions list includes only asthma. [*Id.* at 68 (Health Conditions List)]. Although he was prescribed an albuterol inhaler, there are no medical records showing an exacerbation or that he required use of his inhaler more than once per year. *See, e.g.* [*Id.* at 16 (02/19/2020 med. note)]("last used inhaler 1 year ago"). During his pre-sentence investigation interview, Mr. Henderson informed the interviewing probation officer that his last asthma attack was at age 15, ten years before the interview. [PSR ¶ 50]. The CDC considers moderate to severe asthma as a condition that might increase an individual's likelihood of severe complications from the virus. *People with certain medical conditions*, Ctrs. for Disease Control and Prevention. The medical records reflect that Mr. Henderson's asthma is well controlled with minimal medical intervention. Thus, the Court cannot conclude that Mr. Henderson's asthma potentially places him at a medically recognized risk of severe complications from the virus because there is no indication that his asthma is "moderate to severe".

Obesity, defined as having a BMI greater than 30 kg/m$^2$, is among the conditions that the CDC recognizes as increasing a person's risk of severe illness from coronavirus. *Id.* The parties' calculated Mr. Henderson's BMI as about 32 kg/m$^2$ using his height (5'7 feet) and weight (last at 204 lbs.) from the BOP inmate health records. [Dkt. 51 (Def. Mem. in Supp.) at 1-2]. The BOP, however, does not consider Mr. Henderson obese. [Dkt. 53 (Sealed Med. R.) at 56](12/04/2019 history and physical exam note)("Obese: no"). The BOP medical records do not include a BMI

measurement. *Compare to United States v. Newton*, No. 3:18-CR-0022-8(VLB), 2020 WL 6784267, at *5 (D. Conn. Nov. 18, 2020)(medical records show that the BOP considered defendant with BMI between 30-31 kg/m$^2$ as obese). The Court has considered the possibility that the parties' BMI calculation may not accurately reflect whether Mr. Henderson is clinically obese because the measurement does not account for differences in an individual's physical build. See *Assessing Your Weight and Health Risk*, Nat'l Heart, Lung, & Blood Inst., https://www.nhlbi.nih.gov/health/educational/lose_wt/risk.htm#limitations (last reviewed Dec. 8, 2020)(describing limits to utility of BMI metric, including that it may overestimate or underestimate body fat, and explaining that assessment of weight and health risk involves consideration of BMI, waist circumference, and risk factors for obesity-related diseases and conditions). The Court declines to rely on the parties' calculation of BMI alone as an estimation of whether Mr. Henderson is obese when it is contradicted by the examining health professional's contemporaneous diagnostic notes and in the absence of any evidence showing that he has any medical problems related to his weight. *See United States v. Elliott*, No. 17-CR-128 (ARR), 2020 WL 4381810, at *5 (E.D.N.Y. July 31, 2020)(declining to find extraordinary and compelling circumstances where defendant's BMI (33 kg/m$^2$) was only slightly over the at-risk threshold, defendant was thirty-three years old, he did not claim to have any health complications related to his weight, and his medical records did not document any obesity-related concerns, and BMI does not necessarily convey a complete picture of one's health).

Moreover, the Defendant is 26 years old. In Connecticut there have been 24,576 COVID-19 cases among individuals between the ages of 20-29, the most of any age group. Conn. Dep't. of Pub. Health, *Coronavirus Disease 2019 (COVID-19)*. However, in the macabre reality of mortality statistics, there have been six fatal cases in this age-demographic group, meaning that .02% of cases have been fatal. *Id.*[3] Presumably, many citizens at liberty who have recovered suffer from more serious health conditions than Mr. Henderson's well controlled asthma and potential marginal obesity. Indeed, Mr. Henderson has received regular and comprehensive medical care while in custody that he had not received when he was previously at liberty. *See* [PSR ¶¶ 50-51]("He does not have an inhaler at this time. He also advised he was diagnosed with a heart murmur as a child but 'hasn't had it checked in years.' He shared he is not taking any medication nor under the care of a physician.")

The Court recognizes the ominous threat of an outbreak of the virus at a jail or prison. The rapidly changing conditions at FCI Schuylkill illustrate this point. Based on historic data now available from the U.S. Department of Justice's Office of the Inspector General, officials at FCI Schuylkill kept the virus at bay for over nine months: as of December 4, 2020 there was only one active case and one recovered inmate among the 1,035 inmates at the prison complex. OIG-BOP COVID-19 Interactive Dashboard, Office of the Inspector General,

---

[3] The Court was unable to locate statistics from the Connecticut Department of Public Health to show the number of COVID patients requiring admission to an intensive care unit, which would also be indicative of a serious, adverse health outcome.

14

https://www.arcgis.com/apps/MapSeries/index.html?appid=a3e98be1aab94eadaaeaa96ed176f418 (data last updated Dec. 6, 2020). When the Court reviewed the BOP's updated data for FCI Schuylkill on December 8th, there was only four active cases reported and five inmates had recovered. Now, the BOP reports 89 active cases among inmates. *See* Fed. Bureau of Prisons, *BOP COVID-19 Cases* (Table), https://www.bop.gov/coronavirus/index.jsp, (last updated 12/10/2020). There are no fatal cases reported at the facility. Even accounting for the concerning rise in cases, the case rate at the facility is still well below the BOP's total national rate. The facility's track record thus far would suggest that officials at FCI Schuylkill can contain the outbreak. At this juncture, too little is known about the situation and the containment measures for the Court to find that the state of the pandemic at FCI Schuylkill shifts the balance of considerations in favor of finding extraordinary and compelling reasons for release, given the Defendant's age and the lack of medical evidence showing that he is particularly susceptible to severe complications.

Considering a "full slate" of reasons for compassionate release, the Court finds that Mr. Henderson's potential obesity and well controlled asthma does not established "extraordinary and compelling" reasons for his release, particularly in view of the comprehensive health care that he is receiving, and his age. *See also, United States v. Goldberg*, No. 13-CR-120 (JMA), 2020 WL 6273947, at *3 (E.D.N.Y. Oct. 26, 2020)(denying compassionate release for an offender with a BMI of 40.1 and citing examples of other courts denying compassionate release to offenders with obesity).

Even if the Court were to conclude that Mr. Henderson carried his burden of establishing "extraordinary and compelling" reasons for release, consideration of the 18 U.S.C. § 3553(a) sentencing factors would militate against modification of his sentence.

### III.    § 3553(a) sentencing factors

Because the Court concludes that Mr. Henderson did not carry his burden of establishing "extraordinary and compelling" reasons to modify his sentence, the Court will only briefly discuss why the § 3553(a) sentencing factors further militate against granting Mr. Henderson's motion for compassionate release. The Court's balancing of the § 3553(a) sentencing factors remains unchanged since sentencing.

First, the sentence in this matter reflected the need to promote respect for the law and deter him from committing further crimes. Moreover, his proclivity towards the illegal possession of firearms poses an acute danger to the public. Mr. Henderson committed the instant offense involving a firearm which he knew he could not legally possess notwithstanding the fact that he had previously been convicted of illegally possessing a firearm and was on state probation for that violent firearms offense in which he critically shot another teenager multiple times. The fact that he could be sent to prison for five years if he violated his state probation did not deter him from committing the instant offense.

A day after Mr. Henderson asked for the warden to trust him by releasing him into the community, he committed a serious disciplinary infraction. [Dkt. 55-4]. This

provides further support that the Court's view of the Defendant's personal characteristics from sentencing remains applicable: "The defendant needs to be deterred and he needs to have impressed upon him the fact that the law is not a suggestion or an invitation. It is a serious mandate, and a violation of the law has serious consequences. The defendant's conduct, both past and his most recent conduct, indicates that he is a serious risk of harm to the community, and continues to be." [Sent. Tr. at 34:10-34:17].

Defendant does not posit that he has voluntarily engaged in any pro-social, self-help, educational or rehabilitative activities while in custody. The court recognizes that programing in the facility is limited but there are independent means of self-improvement which Defendant has not used. Consequently, the Court lacks a basis to conclude that Mr. Henderson's stated desire towards rehabilitation would be sufficient to overcome his demonstrated recidivism and lack of initiative.

While the Court recognizes that Mr. Henderson is approaching the end of his sentence, the Court cannot conclude that the unserved custodial sentence would be futile in light of the recidivism risk that Defendant poses. The remaining period of incarceration will provide Mr. Henderson with additional time to reflect upon his choices and to prepare himself to re-enter society upon the conclusion of his sentence.

## Conclusion

For the above stated reasons, the Court DENIES Mr. Henderson's motion for compassionate release without prejudice to renewal if the material facts in support

of Mr. Henderson's motion change, i.e. conditions at FCI Schuylkill deteriorate, Mr. Henderson's personal health status changes, or new scientific information from authoritative sources emerges.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated this 11th day of December at Hartford, Connecticut.